2015 IL App (1st) 122451

THIRD DIVISION
May 27, 2015

No. 1-12-2451

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | No. 06 CR 16086-02 |
| v. | ) | |
| | ) | |
| ROMARR GIPSON, | ) | The Honorable |
| | ) | Brian K. Flaherty |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Pucinski and Justice Mason concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant Romarr Gipson was tried and sentenced as an adult for offenses he committed

as a juvenile. After defendant was automatically transferred from juvenile court to adult court,

the court found him unfit to stand trial but later determined he had been restored to fitness. The

trial court found defendant guilty of the attempted first-degree murder of Clifton Smith and

Anthony Milton, aggravated battery with a firearm and aggravated discharge of a firearm. The court also found that he personally discharged a firearm. Acknowledging its limited sentencing discretion, the trial court imposed the minimum sentence for two counts of attempted murder, a cumulative sentence of 52 years in prison. On appeal, defendant challenges the fitness restoration proceedings, the imposition of two firearm enhancements and the constitutionality of the statutory transfer and sentencing scheme. We reverse and remand for further proceedings.

¶ 2                                  I. BACKGROUND

¶ 3                                  A. Pretrial

¶ 4      Defendant, then 15 years old, and his older half-brother, codefendant Roman Formin, were charged with 14 counts arising from a shooting on June 14, 2006. Defendant, who had just turned 15 years old when the offense occurred, was transferred to adult court due to the exclusive jurisdiction provision of the Juvenile Court Act of 1987, otherwise known as the Illinois automatic transfer statute. 705 ILCS 405/5-130 (West 2006); see *People v. Patterson*, 2014 IL 115102, ¶ 2. This was not, however, defendant's first encounter with the legal system.

¶ 5      The record indicates that during defendant's early childhood, he lived with both parents and his siblings in a relatively stable home, although at one point, defendant reported using marijuana by age seven. At the same age, in 1998, defendant was arrested for the murder of Ryan Harris. Defendant, who had just completed kindergarten, was the youngest person in our nation to be charged with murder. An eight-year-old boy was also charged. *In re Harris*, 335 Ill. App. 3d 517, 519 (2002). At this time, defendant was detained at Hartgrove Hospital in lieu of jail but apparently not for the purpose of psychiatric treatment. After semen was discovered on the victim's underwear, the State determined that a different individual was responsible, not the two boys. It appears that Floyd Durr ultimately pled guilty without qualification to the sexual assault

2

of Harris and entered a guilty plea to murder pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970).[1] Following this incident, the relationship between defendant's parents deteriorated and defendant suffered from post-traumatic stress disorder (PTSD). This would be one among many psychological and mental afflictions suffered by defendant.[2]

¶ 6    Several different judges presided over defendant's present case. During those proceedings, it became known that about six months before this offense occurred, Judge Stuart F. Lubin found defendant unfit to stand trial in an unrelated juvenile case, which apparently involved an animal cruelty charge based on defendant killing a dog by slamming it into concrete (No. 05 JD 5967). In addition, defendant was hospitalized for psychiatric reasons on several occasions during these proceedings. At times when defendant was released on bail and was not hospitalized, he attended therapeutic day school. Defendant also had encounters with the police before trial, although they did not all lead to convictions. On one occasion, defendant threw a bag containing suspected cannabis on the ground and fled from the police. On other occasions, he shoplifted and threatened an individual with a BB gun. He was also reported to have attacked his mother. While the record contains extensive information regarding defendant's mental health, we recite only those facts necessary to understand the issues on appeal.

¶ 7    In 2007, the Illinois Department of Human Services (IDHS) determined that defendant was unfit to stand trial based on the same opinion of psychiatrist Joseph McNally. Dr. McNally, who worked at Streamwood Behavioral Health Systems (Streamwood), found that defendant's eye contact was intermittent, his affect was blunted, his knowledge was below average, and he

---

[1] An *Alford* plea occurs where the defendant pleads guilty in light of a strong factual basis but nonetheless proclaims his innocence. See *People v. Cabrera*, 402 Ill. App. 3d 440, 444 (2010).

[2] In October 2004, defendant settled his lawsuit against the City of Chicago for $2 million, which was placed in an annuity. Defendant's eight-year-old codefendant in the Harris case settled for $6.2 million in 2005.

was guarded, but he cooperated and was alert. In addition, defendant had a deficit in concentration, and his IQ was 58, placing him in the mild mental retardation range. Dr. McNally's report also noted, however, that Dr. DiDomenico found defendant's ability to question him strongly indicated that defendant's capabilities were better than his score suggested. Dr. DiDomenico suspected that defendant was malingering. In addition, defendant, who could be disruptive and threaten peers, had recently been restrained and given antipsychotic medication targeting aggression after an episode of agitation.

¶ 8     Defendant was diagnosed with mood disorder, attention deficit hyperactivity disorder, conduct disorder, a history of auditory processing disorder and mild mental retardation or borderline intellectual functioning. In addition, Dr. McNally could not rule out PTSD and defendant was being given psychotropic medication to help with anxiety, poor focus, aggressive tendencies and mood lability. Regarding fitness, defendant struggled with concepts of oath and perjury, and had a limited understanding of plea bargaining but Dr. McNally also sensed that defendant did not put forth his best effort to learn the fitness material. In August 2007, the trial court agreed that defendant was unfit to stand trial.

¶ 9     By November 2007, Streamwood found defendant was fit to stand trial but in the spring of 2008, IDHS disagreed, as did Ada S. McKinley Community Services, Inc. Dr. Carl Wahlstrom, the forensic psychiatrist hired by defendant, also found defendant was unfit. We further note that at a hearing on September 5, 2008, defense counsel expressed concern regarding defendant's inability to cooperate with him and stated that defendant was not receiving his medication in jail. In November 2008, social worker Marcy Lerner met with defendant and his mother, apparently at Dr. Sharon Coleman's request, and found that defendant was non-compliant with psychotropic medications. Although defendant's mother was not sure whether he

4

was taking his medication, the assistant State's Attorney (ASA) reported that defendant was refusing medication. Lerner also stated that when defendant was anxious, he self-mutilated by picking his skin and, consequently, his finger was permanently deformed. Lerner found defendant was traumatized by the 1998 arrest.

¶ 10   At about the same time that Lerner completed her report, Dr. Coleman found defendant was fit to stand trial because he understood the nature and purpose of the proceedings against him and was able to assist in his defense, if he chose to do so. She stated that she had not addressed defendant's fitness to stand trial with medication because he had not been prescribed psychotropic medication. This determination was seemingly based on the October 2008 medication profile from Cermak Health Services, which noted that defendant had no active prescriptions. In addition, Coleman reported that defendant said he was last compliant with a medication regimen in September 2008. Regarding the proceedings against him, defendant said, "they can't do nothing to me because they know that I have been traumatized when had [*sic*] I was young." Following an examination on November 25, 2008, psychiatrist Dr. Nishad Nadkarni similarly found that defendant was fit to stand trial, noting that he was not presently prescribed psychotropic medications and there was no indication that they were needed.

¶ 11   At a hearing before Judge Jorge Luis Alonso on April 7, 2009, defense counsel said that defendant was not getting any medications in jail and asked the court to have the jail transfer defendant to the psychiatric unit for an evaluation. Defense counsel was not sure that the jail was aware of defendant's mental illness history. The court ordered the transfer but acknowledged the possibility that the sheriff would ignore the order. In May 2009, Judge Alonso ordered that defendant's fitness be reevaluated.

¶ 12    After reexamining defendant on August 17, 2009, Dr. Wahlstrom modified his prior opinion, finding that defendant understood the charges as well as the role of courtroom personnel and proceedings. Dr. Wahlstrom also found, however, that "[i]t may be helpful, secondary to cognitive limitations (borderline intellectual functioning versus upper level mild mental retardation) to provide simple explanations of legal matters with frequent review to ensure his adequate understanding." In contrast to Dr. Wahlstrom's prior opinion, he now believed defendant understood his attorney, trusted him and would work with him. With that said, defendant had residual PTSD symptoms, such as emotional reactivity and being guarded, and should continue to receive psychiatric services, counseling and medication therapy. Dr. Wahlstrom further noted that defendant currently took Risperdal but that his medication was not impairing his ability to concentrate. Dr. Wahlstrom concluded, "Mr. Gipson is mentally fit (at least marginally) to stand trial with medication."

¶ 13    A month later, Dr. Jonathan Kelly evaluated defendant's fitness on the State's behalf. Defendant said he had been in "one hundred thousand" fights but never threatened anyone with a gun. Dr. Kelly observed sores covering defendant's face due to picking his skin. He avoided eye contact, was oppositional, irritable, impatient, and angry but was alert and oriented. He sang to himself while pounding his hand on the wall or table and was restless. Although Dr. Kelly first noted that defendant spoke in phrases rather than sentences, he later noted that defendant was able to speak in full sentences. In addition, defendant lacked insight, had a history of poor judgment and impulse control, and gave responses that were inconsistent with both his other responses in this interview as well as prior evaluations. Defendant said he did not trust his attorney and did not care what his attorney did.  Defendant also thought that he was unfit to stand trial. Dr. Kelly, however, believed defendant was invested in being found unfit. Furthermore,

defendant said he was on Risperdal because he would "splash out" and fight, and that his medicine led to drowsiness and headaches if he did not eat. He believed the medicine made one worse but he did not skip doses. When asked if he had symptoms of *mental* illness, defendant responded that his body would hurt and he would have a headache. Moreover, defendant did not believe his behavior was consistent with conduct disorder, but records suggested otherwise.

¶ 14    Dr. Kelly diagnosed defendant with a history of conduct disorder but could not rule out cannabis dependence, malingering or borderline intellectual functioning. In addition, Dr. Kelly found defendant was fit to stand trial, without medication, as he adequately understood the charges and the nature of proceedings and was able to assist in his defense. Although defendant was taking Risperdal, an antipsychotic medication, defendant did not experience side effects that would interfere with his fitness to stand trial and did not need medicine to maintain his fitness.

¶ 15    Defendant appeared before Judge Maura Slattery Boyle, for the first and only time, at his fitness restoration hearing on October 2, 2009. While defense counsel tendered Dr. Wahlstrom's recent report and Lerner's 2008 report, the State tendered Dr. Kelly's report. The court noted that the parties stipulated to the authenticity and admissibility of the doctors' reports, stating:

> "And as I understand it the parties have agreed as to the authenticity and admissibility of Defense Exhibit No. 1. *** and Mr. Urdangen, please correct me if the Court is wrong, that Mr. Gipson had been evaluated twice and at one point the doctor had questioned Mr. Gipson's fitness. On a subsequent evaluation the doctor could not - - changed his position and could not rule out that Mr. Gipson was fit to stand trial. Is the Court correct as to that statement in regards to the doctor's evaluation?"

Defense counsel confirmed that the court was substantially correct. The court then stated, "And just so that it's clear, the prior determination was that he was unfit and this most recent ***

7

indicates he is marginally fit with medication." After the court stated that it had reviewed the documents, the following colloquy ensued:

"THE COURT: And just so the record is clear, both parties I assume, *** agree that the doctors who have conducted these evaluations of Mr. Gipson are extremely qualified and in regards to their experience and ability it is, it is unreported [*sic*] and both of them are deemed highly qualified in the community, is that correct, Mr. Darman?

MR. DARMAN [Assistant State's Attorney]: Yes, Judge.

THE COURT: And Mr. Urdangen?

MR. URDANGEN [defense attorney]: Yes, Judge. Also I would just say I would not contest the qualifications of the State's expert.

* * *

THE COURT: Therefore then as indicated the most recent one conducted by the Defense, by Carl Wahlstrom, had originally indicated that Mr. Gipson was unfit. *** [A] re-evaluation was conducted or an additional evaluation, at which time Mr. Wahlstrom's opinion changed from the original one and indicated again that Mr. Gipson is marginally fit with medication.

Therefore, due to the change and opinion of Dr. Wahlstrom, the Defense no longer adhering to the original and being of a new opinion that he is marginally fit with medication as well as the State's expert's opinion that Mr. Gipson is fit, the Court will find that Mr. Gipson is fit to stand trial."

Although Judge Boyle relied on both reports, she did not expressly reject or question the qualification to Dr. Wahlstrom's opinion, *i.e.*, that defendant was only marginally fit if medicated.

8

¶ 16                                    B. Trial

¶ 17    At the bench trial before Judge Brian K. Flaherty, the State's evidence generally showed that at about noon, Anthony Milton and Clifton Smith were in Milton's car at a gas station when codefendant approached the passenger side of the car with a gun and fired shots at Smith. As Milton attempted to exit through the driver's side window, defendant approached from that side and raised his weapon. Milton was shot in the left buttock. Nearby bike patrol officers arrived soon after. We note that a surveillance video presented at trial is not included in our record on appeal. Smith, who was shot two or three times, had extensive injuries. The most damaging of his gunshot wounds entered his right upper chest and exited his right back. In addition, he had several surgeries, including a kidney transplant, and spent three months in the hospital. As to Milton, the bullet that entered his buttocks exited from his thigh. He was discharged from the hospital the same day but experienced numbness in his leg. In addition to evidence regarding the shooting itself, the parties presented expert testimony regarding defendant's mental health, as defense counsel's position was that defendant was a "disturbed retarded child" under his older brother's spell and did not intend to kill anyone. The experts' testimony, however, went beyond his mental abilities at the time of the offense.

¶ 18    Dr. Wahlstrom testified that he changed his fitness opinion because at their final meeting, defendant had benefitted from the additional effects of age and treatment. Toward the beginning of their interaction, defendant was at the lowest end of the continuum regarding communication ability. Assessments closer to the time of the incident were consistent with extreme verbal impairment, which would have affected defendant's ability to understand situations. In addition, Dr. Wahlstrom found no evidence of malingering aside from defendant being withdrawn during exams, which could also show difficulty communicating. Moreover, defendant's improvement

showed he was not malingering. We note that Dr. Wahlstrom did not address his finding that defendant was only marginally fit with medication.

¶ 19    Dr. Coleman testified that she found defendant fit to stand trial in 2008. During their meetings, he followed directions, made good eye contact and was alert. There was no apparent disturbance of concentration but he had a speech impairment in that he would mispronounce words or use words that did not correspond to his meaning. With that said, he understood questions asked and his speech disorder would not prevent him from communicating. In addition, his ability to process information was impaired but Dr. Coleman could not speak to how substantial that impairment was. Dr. Coleman further testified that conduct disorder, which defendant had been diagnosed with, typically involved impulsivity and a disregard for others' rights. She also found that defendant's test results underestimated his ability but she did not form the opinion that he was malingering. When asked about his lawyer's role, defendant said that his lawyer was supposed to get his case thrown out. Moreover, defendant indicated that he experienced flashbacks while in the courtroom. Dr. Coleman agreed that defendant had suffered from PTSD, but she believed he was in remission as of 2008.

¶ 20    Following evidence and argument, Judge Flaherty stated he had no doubt that defendant and codefendant acted in tandem. The court found defendant guilty of attempted first-degree murder, aggravated battery with a firearm and aggravated discharge of a firearm with respect to Smith and Milton as alleged in 10 counts. All counts merged into two counts of attempted first-degree murder.

¶ 21                                C. Posttrial

¶ 22    Following trial, defendant moved for the court to declare that Illinois' sentencing scheme, in conjunction with the automatic transfer statute, was unconstitutional as applied because it

violated his eighth amendment right to be free from cruel and unusual punishment. Defendant argued that the minimum sentence in this instance, 52 years, was materially indistinguishable from life without parole and did not provide him with a meaningful opportunity to obtain release based on maturity and rehabilitation. According to the National Center for Health Statistics, the average life expectancy of African Americans was 67.8 years. The court denied the motion.

¶ 23 At sentencing, the State noted that defendant had recent convictions for possession of a controlled substance (No. 08 CR18069) and aggravated battery (No. 10 CR 11443). The State's witnesses relayed details of the prior animal cruelty charge and another incident in which he accidentally shot a victim in the leg. The court asked the ASA,"[W]hat is the sentencing scheme? What's the minimum sentence?" Both parties agreed that the minimum cumulative sentence would be 52 years in prison. Specifically, the minimum sentence for each count of attempted murder was 6 years in prison plus a 20-year enhancement on each count for personally discharging a firearm. In addition, the counts would be consecutive due to the seriousness of the injuries and he would be required to serve 85% of his sentence. The ASA argued that the most aggravating factor aside from testimony about other incidents was the surveillance video, which captured the entire incident. In contrast, defense counsel argued that defendant was one month past his 15th birthday when the offense occurred and that he had already been found unfit at that time. Counsel emphasized defendant's mental impairments, as well as the relatively superficial wound sustained by Milton, whom defendant personally shot.

¶ 24 The court found as follows:

"This case is a tragedy on so many different levels. It's a tragedy. And I've got - - I read all the reports. *** And to say that Mr. Gipson had a troubled childhood would be an understatement. It is a tragedy what happened to Mr. Gipson. That is, I don't think

there's anybody here that would disagree with that statement about what happened to him when he was wrongfully accused as a seven year old.

However, fast forward, the system failed Mr. Gipson. I don't think there's anyone here who would dispute that. He certainly had some mental health issues and some other issues that should have been dealt with. They apparently, from the reports I read, weren't dealt with.

Now, let's go back, let's go forward to this case here. This case is nothing but, as far as I'm concerned, an ambush. The defendant and his brother, step-brother, approached these two individuals, then came back when the two individuals were in the car.

Literally, they are trapped in the car. Because they, both men, the step-brother was on the passenger side, the defendant was on the driver's side, and both opened fire at the individuals. There is nothing but - - it was nothing but an ambush.

And unfortunately, Mr. Urdangen, I'm going to follow the law. Unless somebody in the Appellate Court thinks - - whether or not I think - - doesn't matter what I think is appropriate, what I don't think is appropriate. They took that out of my hands a long time ago."

For each count, the court sentenced defendant to 6 years in prison plus a 20-year enhancement for personally discharging a firearm, to be served consecutively.

¶ 25    After admonishing defendant regarding his appeal rights, the court asked defendant if he understood. The transcript reflects a pause, following which, defense counsel stated, "Your Honor, I think Mr. Gipson is having a hard time paying attention to anything, and I wonder if perhaps we could consider admonishing him when we [*sic*] comes back for a motion to reconsider. " Instead, the court passed the case and readmonished defendant following a recess.

Defendant then said he understood. Ten days later, the United States Supreme Court issued its decision in *Miller v. Alabama*, 567 U.S. _, 132 S. Ct. 2455 (2012), which held that the eight amendment prohibits sentencing schemes that mandate the imposition of life-without-parole sentences on juveniles. *Id*. At the hearing on defendant's motion to reconsider, the trial court agreed with the State's assertion that *Miller* was distinguishable.

¶ 26                                    II. ANALYSIS

¶ 27                              A. Fitness to Stand Trial

¶ 28     On appeal, defendant challenges the propriety of his fitness restoration hearing. Specifically, he asserts that the trial court erred by relying solely on the experts' stipulated reports. Initially, the State asserts that defendant forfeited this issue by failing to raise it prior to trial and in a posttrial motion. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 50. Fitness for trial, however, involves a fundamental right. *Id*. Accordingly, courts have repeatedly determined that alleged errors concerning fitness may be reviewed under the plain error doctrine. *People v. Cook*, 2014 IL App (2d) 130545, ¶ 13; *People v. Esang*, 396 Ill. App. 3d 833, 840 (2009); *People v. Contorno*, 322 Ill. App. 3d 177, 180 (2001). We likewise review defendant's contention.

¶ 29     Due process prohibits the criminal prosecution of a defendant who is unfit to stand trial. *People v. Taylor*, 409 Ill. App. 3d 881, 895-96 (2011). A defendant is unfit to stand trial when a mental condition renders him unable to understand the purpose and nature of the proceedings against him or to assist counsel in his defense. *Cook*, 2014 IL App (2d) 130545, ¶ 12 (citing 725 ILCS 5/104-10 (West 2010)). With that said, fitness involves a defendant's ability to function at trial, not his sanity or competence in other contexts. *Taylor*, 409 Ill. App. 3d at 896. Thus, a defendant may be fit for trial but otherwise mentally unsound. *Id*. In addition, where a defendant was previously adjudicated to be unfit to stand trial, a presumption exists that the condition of

unfitness remains until the defendant has been adjudicated to be fit at a valid subsequent hearing. *People v. Greene*, 102 Ill. App. 3d 639, 641-42 (1981). Furthermore, the court should be active, not passive, in assessing a defendant's fitness. *People v. Thompson*, 158 Ill. App. 3d 860, 865 (1987). Because fitness involves an issue of constitutional dimension, the record must affirmatively show the exercise of the court's discretion and judgment. *Cook*, 2014 IL App (2d) 130545, ¶ 13; *Greene*, 102 Ill. App. 3d at 642; see also *Contorno*, 322 Ill. App. 3d at 179 (acknowledging that the trial court may have made an independent determination of fitness but that the record did not affirmatively show that). It does not follow, however, that the trial court is required to make detailed findings regarding fitness. *People v. Goodman*, 347 Ill. App. 3d 278, 287 (2004).

¶ 30    Moreover, the trial court may consider an expert's stipulated testimony to assess a defendant's fitness but may not rely solely on the parties' stipulation to an expert's *conclusion* that the defendant is fit. *Taylor*, 409 Ill. App. 3d at 896; *Greene*, 102 Ill. App. 3d at 642; but see *Contorno*, 322 Ill. App. 3d at 179 (adding that fitness cannot be based solely on "a stipulation to the existence of psychiatric conclusions *or findings*" (emphasis added)). The distinction between proper and improper stipulations, however, is a fine one. *Thompson*, 158 Ill. App. 3d at 864. Where the trial court's determination is based on not only stipulations, but on the court's review of a psychological report and the court's own observations of the defendant, due process is generally satisfied. *Cook*, 2014 IL App (2d) 130545, ¶ 15; see also *Esang*, 396 Ill. App. 3d at 839 (stating that the trial court must analyze and evaluate an expert's basis for his opinion). After considering stipulations and personally observing the defendant, a circuit court can either (1) find the defendant fit; (2) find the evidence insufficient to demonstrate that the defendant's fitness has been restored; or (3) seek additional information. *People v. Lewis*, 103 Ill. 2d 111, 116 (1984).

¶ 31    The parties dispute the appropriate standard of review to be applied in this instance. Defendant contends that no factual dispute or credibility assessment is involved and, thus, our review is *de novo*, but defendant has not cited any case applying a *de novo* standard of review to this particular issue. See *In re D.G.*, 144 Ill. 2d 404, 408-09 (1991) (applying a *de novo* standard of review to analysis of probable cause). In addition, as we will discuss further, the two experts did not reach identical conclusions. Accordingly, it is not entirely accurate in this instance to say that the trial court was not required to make a credibility assessment. In contrast, the State asserts that we may not reverse the trial court's judgment unless it was against the manifest weight of the evidence. To the State's credit, our supreme court has recently applied that standard of review to the ultimate determination that fitness has been restored. See *People v. Stahl*, 2014 IL 115804, ¶ 26; but see *Cook*, 2014 IL App (2d) 130545, ¶ 13 (a trial court's determination that a defendant is fit to stand trial generally will not be reversed absent an abuse of discretion). With that said, our initial question is whether the trial court had sufficient information before it to make an informed decision. Applying the manifest weight of the evidence standard would presume that a proper and complete hearing was held. Regardless of which standard of review applies, we find further proceedings are required.

¶ 32    Here, the parties stipulated to the reports of Dr. Kelly and Dr. Wahlstrom, not merely their conclusions. *Cf. Contorno*, 322 Ill. App. 3d at 179 (finding it was unclear whether stipulation was to the report's ultimate conclusion or to the notion that the expert's testimony would conform with his report); *Greene*, 102 Ill. App. 3d at 641-43 (finding the fitness hearing was insufficient where the parties stipulated not only to the contents of experts' reports, but also stipulated to the fact that the defendant was fit for trial). In addition, the parties did not stipulate to the ultimate issue of defendant's fitness, notwithstanding that the trial court used certain loose

language suggesting otherwise. We note that at oral arguments, the State represented that "all parties agreed that defendant was no longer unfit," a representation suggesting that the parties improperly stipulated to the conclusion that defendant was fit. We disagree with the State's curious characterization of the parties' agreement, a characterization that would, if accurate, have been favorable to defendant's position on appeal. We are nonetheless troubled by the role that the experts' differing conclusions played in determining that defendant's fitness was restored.

¶ 33    Dr. Kelly, without qualification, opined that defendant was fit to stand trial. In contrast, Dr. Wahlstrom opined, "Mr. Gipson is mentally fit (at least marginally) to stand trial with medication." The trial court relied equally on both doctors' opinions, stating, "[t]herefore, due to the change and opinion of Dr. Wahlstrom, the Defense no longer adhering to the original and being of a new opinion that he is marginally fit with medication as well as the State's expert's opinion that Mr. Gipson is fit, The Court will find that Mr. Gipson is fit to stand trial."

¶ 34    Under our jurisprudence, a defendant is either fit to stand trial, fit to stand trial with medication, or not fit. Dr. Wahlstrom's opinion, on which the court appeared to heavily rely, did not reach any of those determinations. Instead, Dr. Wahlstrom found defendant to be "marginally" fit. Our jurisprudence recognizes no such qualification to a defendant's fitness. As stated, stipulations to experts' reports are generally acceptable. Here, however, Dr. Wahlstrom's opinion required the trial court to seek more information in order to make an informed decision, namely, what Dr. Wahlstrom meant by "marginally." Instead, Judge Boyle relied on Dr. Wahlstrom's opinion without question.

¶ 35    While Dr. Kelly, and ultimately the trial court, determined that defendant was fit to stand trial without medication, Dr. Wahlstrom reached the opposite conclusion. The record does not disclose why Dr. Wahlstrom believed defendant was only fit with medication or the trial court's

means of resolving the experts' conflicting opinions. We also note that contrary to the State's suggestion at oral arguments, twice during pretrial proceedings, defense counsel had informed judges who previously presided over defendant's case that defendant was not receiving necessary medication in jail. See *Stahl*, 2014 IL 115804, ¶ 26 (the ultimate determination regarding whether a defendant is fit to stand trial must be considered in light of all circumstances). That earlier representation as well as Cermak's belief in October 2008 that defendant had not been prescribed medication raises questions regarding whether the State was always aware of what defendant had been prescribed or needed. At a minimum, whether defendant needed medication would impact his ability to assist counsel.  In addition, defendant alternated between trusting and not trusting counsel, and his behavior at the last meeting with Dr. Kelly was seemingly bizarre. Furthermore, although not information before Judge Boyle, we note that defendant experienced difficulty concentrating at sentencing before Judge Flaherty, which places some doubt on defendant's ability to listen at trial so as to assist counsel in his defense.

¶ 36    We are also troubled by the court's statement that Dr. Wahlstrom "could not rule out that Mr. Gipson was fit to stand trial." As stated, the presumption at a restoration hearing is that the defendant is unfit. Thus, we presume that the state of things continues until the contrary is shown. *People v. Mata*, 316 Ill. App. 3d 849, 853 (2000). The question here is whether the trial court could rule out the possibility that defendant was still *unfit*. In addition, while the trial court is not as a rule required to question the defendant, the court did not do so here, notwithstanding that this was Judge Boyle's first encounter with defendant. *Thompson*, 158 Ill. App. 3d at 865 (finding that whether the trial court questioned the defendant directly is a factor, although not dispositive). She did not question defense counsel regarding his own interaction with defendant either.

17

¶ 37    As stated, following a fitness hearing, the court may choose from one of three options. In this instance, the court should have chosen the third option, to seek additional information. Contrary to the State's assertion, we do not find that this court's decision in *Taylor* requires a different result. There was no indication in *Taylor* that an expert qualified his opinion regarding fitness in a manner that left the expert's opinion unclear. *Taylor*, 409 Ill. App. 3d at 896. In addition, there was no indication that the trial court there misapplied the presumption of unfitness. Moreover, unlike the present case, in *Taylor*, the two doctors concurred in their assessment, finding that the defendant was fit to stand trial with medication. *Id*. at 884-86.

¶ 38    Having determined that error occurred, we must determine what relief is appropriate. While our supreme court previously disapproved of retroactive fitness hearings, that disapproval has since been overcome. *People v. Steppan*, 322 Ill. App. 3d 620, 631 (2001); *People v. Melka*, 319 Ill. App. 3d 431, 436, 439 (2000); but see *Esang*, 396 Ill. App. 3d at 840 (Retrospective fitness hearings are generally inappropriate where the defendant was tried and sentenced more than a year earlier.). "[I]t appears that retrospective fitness hearings are now the norm." *People v. Mitchell*, 189 Ill. 2d 312, 339 (2000); see also *Estock v. Lane*, 842 F.2d 184, 188 (7th Cir. 1988) (The passage of time is not insurmountable if the record contains sufficient evidence from knowledge contemporaneous to the defendant's trial.). We therefore remand this matter to the trial court for a retrospective fitness hearing, at which the parties may present the testimony of Dr. Wahlstrom to clarify the opinion he held at the time of the fitness hearing, as well as the testimony of Dr. Kelly regarding his own opinion at that time. We recognize that at this late date, these experts may be unavailable or may be unable to recall necessary details. If the court determines that evidence is inconclusive or suggests that the defendant was unfit, defendant is entitled to a new trial. *People v. Hill*, 297 Ill. App. 3d 500, 517 (1998). If the court determines

that defendant's fitness without medication at his prior trial can be accurately assessed and confirmed, despite the passage of time, his conviction may be affirmed. *Id.* Under these circumstances, the trial court is in a better position to determine whether Dr. Wahlstrom and Dr. Kelly can provide a complete understanding of their differing opinions.

¶ 39                                        B. Firearm Enhancement

¶ 40     Next, defendant asserts that the firearm enhancement statute permitted the imposition of only one enhancement.[3] We review this question of statutory interpretation *de novo*. *People v. Chenoweth*, 2015 IL 116898, ¶ 20.

¶ 41     Section 8-4(c)(1) of the Criminal Code of 1961 sets forth several sentencing enhancements for attempted first-degree murder. 720 ILCS 5/8-4(c)(1) (West 2006). At issue here, is subsection 8-4(c)(1)(C), which provides that "the sentence for attempt to commit first degree murder is the sentence for a Class X felony, except that *** an attempt to commit first degree murder during which the person personally discharged a firearm is a Class X felony for which 20 years shall be added to the term of imprisonment imposed by the court." 720 ILCS 5/8-4(c)(1)(C) (West 2006). Defendant essentially asserts that the statute is ambiguous as to whether the firearm enhancement may be imposed where a defendant is merely accountable for attempted murder and that this ambiguity must be resolved in his favor. According to defendant, the trial court erroneously imposed two firearm enhancements because his personal discharge of a firearm injured only one victim and defendant was merely accountable for the attempted murder of the second victim. The State responds, in part, that defendant would more accurately be

---

[3] Because defendant's conviction and sentence will not be vacated unless the trial court determines that he was unfit or that his fitness status at the first trial was inconclusive, his sentencing challenges are not moot. *People v. McCoy*, 2014 IL App (2d) 130632, ¶ 11 (stating that an issue is moot where intervening events have rendered it impossible for the reviewing court to grant effectual relief).

characterized as a principal with respect to the attempted murder of both victims. Even assuming defendant's characterization prevails, however, we find no error.

¶ 42     We turn our attention to this court's interpretation of a similar statute setting forth firearm enhancements for first-degree murder. Section 5-8-1(a)(1)(d)(ii) of the Unified Code of Corrections states that "if, during the commission of the offense, the person personally discharged a firearm, 20 years shall be added to the term of imprisonment imposed by the court." 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2006). Recently, in *People v. Flynn*, 2012 IL App (1st) 103687, *appeal denied*, No. 115654 (Ill. May 28, 2014), the reviewing court rejected a similar challenge to that 20-year enhancement. The reviewing court found that "[a]lthough subsection (d)(ii) limits the applicability of accountability principles somewhat by requiring the first degree murder accountable defendant to have personally discharged a firearm, (d)(ii) *** does not contain any language that restricts its application to only those defendants who personally discharged a firearm that actually caused the victim's severe injury or death." *Id*. ¶ 35. In addition, the word "personally" only modifies the clause "discharged a firearm" and, "thus, does not insulate from its application the accountable defendant, like Destephano Flynn, who personally discharged a firearm during the murder offense but may not have fired the actual gunshot that hit the murder victim." *Id*.

¶ 43     In reaching its decision, the reviewing court addressed our supreme court's *dictum* in *People v. Rodriguez*, 229 Ill. 2d 285, 295 (2008). *Flynn*, 2012 IL App (1st) 103687, ¶¶ 36-37. In *Rodriguez*, our supreme court examined whether an unarmed defendant could be subjected to a firearm enhancement under section 5-8-1(a)(1)(d)(i) (730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2006)) based on a theory of accountability. *Rodriguez*, 229 Ill. 2d at 286. That section provided that "if

the person committed the offense while armed with a firearm, 15 years shall be added to the term of imprisonment imposed by the court." 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2006)).

¶ 44    In determining that the firearm enhancement could be imposed despite the defendant not having a firearm at all, our supreme court compared that firearm enhancement to the enhancement found in section 5-8-1(a)(1)(d)(ii). *Rodriguez*, 229 Ill. 2d at 294-95. Although section 5-8-1(a)(1)(d)(ii) requires a defendant to personally discharge a firearm for the enhancement to apply, section 5-8-1(a)(1)(d)(i) does not. *Id*. Thus, the use of the word "'personally[]' *** insulates subsection[] (ii) *** from the application of the principles of accountability and common design." *Id*. Conversely, accountability principles apply without limitation to section 5-8-1(d). *Id*.

¶ 45    The *Flynn* court recognized *Rodriguez* merely found that while a defendant is not required to actually have a firearm in order for the enhancement in section 5-8-1(a)(1)(d)(i) to apply, a defendant is required to personally discharge a firearm for the enhancement in section 5-8-1(a)(1)(d)(ii) to apply. Because the defendant in *Flynn* personally discharged a firearm during the offense, the firearm enhancement applied, even though the defendant himself did not proximately cause the victim's injury. *Flynn*, 2012 IL App (1st) 103687, ¶ 38. The *Flynn* court went on to find that the same reasoning applied to the firearm enhancement for attempted first-degree murder set forth in section 8-4(c)(1). *Id.* ¶ 43.

¶ 46    We find *Flynn* to be well reasoned. Similar to section 5-8-1(a)(1)(d)(ii), section 8-4(c)(1)(C) unambiguously requires an accountable defendant to have personally discharged a firearm but does not require that he personally discharged his firearm at the victim or injured the victim. In addition, "personally" only modifies the clause "discharged a firearm." 720 ILCS 5/8-4(c)(1)(C) (West 2006). The reasoning in *Rodriguez* suggests that had defendant not discharged a

firearm whatsoever, he could not have been accountable for codefendant's personal discharge of a firearm under the attempted murder statute; however, that is not the case before us. Accordingly, the trial court properly imposed two firearm enhancements, regardless of whether defendant was only accountable for the attempted murder of Smith. We need not consider this contention further.

¶ 47                              C. Mandatory Adult Transfer and Sentencing

¶ 48                                  1. Constitutional Requirements

¶ 49    Next, defendant asserts that the statutory scheme which led to his cumulative 52-year sentence violates the eighth amendment to the United States Constitution, the Illinois proportionate penalties clause, and due process, both facially and as applied. Specifically, he asserts that the automatic transfer statute, in conjunction with the applicable sentencing statutes, is unconstitutional. Defendant relies heavily on the United States Supreme Court's recognition that an offender's youth is relevant to his sentence, as reflected in, *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller*, 567 U.S. _, 132 S. Ct. 2455. After filing the appellant's brief in this case, however, our supreme court rejected similar contentions in *Patterson*, 2014 IL 115102. Although defendant maintains that *Patterson* was wrongly decided, he agrees that *Patterson* settled his facial challenges. He nonetheless argues that *Patterson* did not foreclose his as-applied challenges.

¶ 50    A strong presumption exists that statutes are constitutional and courts will uphold a statute whenever reasonably possible, resolving all doubts in favor of the statute's validity. *Id.* ¶ 90. In addition, the challenging party has the burden of rebutting this presumption. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 43. We review a statute's constitutionality *de novo*. *Patterson*, 2014 IL 115102, ¶ 90.

¶ 51     The eighth amendment to the United States Constitution states that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. This amendment prohibits excessive sanctions and requires the government to respect all individuals' dignity. *Roper*, 543 U.S. at 560. Furthermore, the prohibition of cruel and unusual punishment is interpreted through our maturing society's evolving standards of decency. *Id*. at 561.

¶ 52     The United States Supreme Court has repeatedly recognized the special characteristics of juvenile offenders. Juveniles lack maturity and have an underdeveloped sense of responsibility, which leads to poor decision making. *Id*. at 569. They are also more susceptible to negative influences and peer pressure (*Graham*, 560 U.S. at 68; *Roper*, 543 U.S. at 569), and "lack the ability to extricate themselves from horrific, crime-producing settings" (*Miller*, 567 U.S. at _, 132 S. Ct. at 2464). "Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment." *Roper*, 543 U.S. at 570. As a result of these characteristics, juveniles' irresponsible conduct is less morally reprehensible than that of an adult. *Id*. Furthermore, a juvenile's personality traits are more transitory than those of an adult. *Id*. "Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of an irretrievably depraved character ***." (Internal quotation marks omitted.) *Graham*, 560 U.S. at 68. Even heinous crimes do not necessarily mean that the juvenile is irretrievably depraved and a possibility exists that the juvenile may yet be reformed. *Roper*, 543 U.S. at 570. "It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id*. at 573.

¶ 53    These special qualities diminish penological justifications. *Miller*, 567 U.S. at _, 132 S. Ct. at 2465. Retribution is diminished by the offender's reduced blameworthiness. *Id.* Deterrence is not furthered because juveniles are less likely to consider potential punishment. *Id.* The goal of incapacitation and rehabilitation are negated because juveniles are not incorrigible. *Id.* Simply put, youth matters.

¶ 54    In recognition of these realities, over the last decade, the Court has decided three landmark opinions applying the eighth amendment to juveniles. In *Roper*, the Court held that the eighth amendment prohibits the imposition of the death penalty where an offender is under 18 years old when he committed the offense. *Roper*, 543 U.S. at 578. Five years later, the Court held in *Graham* that the eighth amendment prohibited the imposition of life without parole on a juvenile offender who did not commit homicide. *Graham*, 560 U.S. at 74, 82. While the State is not required to guarantee the juvenile eventual freedom for a nonhomicide crime, the State must give defendants a meaningful opportunity to obtain release by demonstrating their rehabilitation and maturity. *Id*. at 74-75. In reaching this determination, the Court recognized that defendants who neither killed nor intended to kill were categorically less deserving of the most serious forms of punishment. *Id*. at 69. Furthermore, life without parole is an especially harsh punishment for a juvenile because he will spend a greater percentage of his life in prison than an adult offender who is given the same sentence. *Id*. at 70.

¶ 55    Most recently, in *Miller*, the Court held that the eighth amendment prohibits sentencing schemes that *mandate* the imposition of life-without-parole sentences on juveniles, even juveniles who commit homicide. *Miller*, 567 U.S. at _, _, _, 132 S. Ct. at 2464, 2469, 2475. Because mandatory penalty schemes prevent the sentencer from considering the defendant's

youth and its accompanying characteristics, such schemes also prohibit the sentencer from considering whether the law's harshest prison term is proportionate. *Id*. at _, 132 S. Ct. at 2466.

¶ 56    Statutes mandating life without parole for juveniles prevent consideration of the defendant's age, immaturity, impetuosity, inability to appreciate risks and consequences, family, environment, the circumstances of the offense, his capacity to assist his attorneys and the possibility of rehabilitation. *Id*. at _, 132 S. Ct. at 2468. In addition, these mandatory life terms create too great a risk that the defendant's sentence will constitute disproportionate punishment. *Id*. at _, _, 132 S. Ct. at 2466, 2469. To be clear, *Miller* does not prohibit the penalty of natural life without parole, but prohibits its mandatory imposition on juveniles. *People v. Davis*, 2014 IL 115595, ¶ 43. A juvenile may still be sentenced to natural life without parole for first-degree murder if the sentence resulted from the trial court's exercise of discretion. *Id*.

¶ 57    We find it unclear whether attempted murder is governed by the holding of *Graham* or the holding of *Miller*, *i.e*., whether juveniles convicted of attempted murder can never be sentenced to life without parole or whether they can be sentenced to life without parole so long as the trial court was given discretion to impose a lesser sentence. As stated, *Graham* relied on the reduced culpability of offenders who neither killed *nor intended to kill* but ultimately held that the eighth amendment prohibited the imposition of life without parole on a juvenile offender who did not commit *homicide*. *Graham*, 560 U.S. at 74, 82. Here, defendant did not commit homicide but the trial court nonetheless determined that he did intend to kill. In the context of the eighth amendment, we seriously question whether attempted murder constitutes a nonhomicide offense. But see *Gridine v. State*, 40 Fla. L. Weekly S149 (Fla. Mar. 19, 2015) (not yet released for publication and subject to withdrawal) (holding that in the context of the eighth amendment, attempted murder was a nonhomicide offense because Florida required that the victim not

survive to qualify as homicide). In any event, we need not resolve that question here. If attempted murder constitutes a homicide offense and defendant's mandatory minimum sentence constitutes natural life without parole, the trial court lacked the discretion required by *Miller*. If attempted murder constitutes a nonhomicide offense and defendant was effectively sentenced to natural life without parole, the sentence categorically violates *Graham*.

¶ 58    Following *Miller*, our supreme court addressed challenges to Illinois's own juvenile statutory scheme in *Patterson*, albeit not in the context of attempted murder. At the heart of these challenges was the effect of the automatic transfer provision (705 ILCS 405/5-130 (West 2008)) and the adult sentences imposed on the defendant. *Patterson*, 2014 IL 115102, ¶ 89. Our supreme court first rejected the defendant's due process challenge to the automatic transfer statute, finding, in part, that the defendant improperly attempted to support procedural and substantive due process claims with case law applying the eighth amendment, a separate constitutional provision. *Id*. ¶¶ 97-98; see also *People v. J.S.*, 103 Ill. 2d 395, 411 (1984) (finding that the automatic transfer statute did not deny the defendant due process or equal protection); *People v. Salas*, 2011 IL App (1st) 091880, ¶ 76 (automatic transfer did not violate due process).

¶ 59    Next, our supreme court rejected defendant's facial challenge to the automatic transfer statute under the eighth amendment. *Patterson*, 2014 IL 115102, ¶¶ 104-06. The court found that the eighth amendment did not apply to the automatic transfer statute because that statute was procedural, not punitive. *Id*. ¶¶ 102, 104-06. Specifically, the court found, "[t]he *mere possibility* that a defendant may receive a potentially harsher sentence if he is convicted in criminal court logically cannot change the underlying nature of a statute delineating the legislature's determination that criminal court is the most appropriate trial setting in his case." (Emphasis added.) *Id*. ¶ 105. We note that in many instances, a defendant's receipt of a harsher sentence is

not a mere possibility, but a guarantee. In any event, our supreme court found the defendant's challenge under the Illinois proportionate penalties clause similarly failed because that clause was "co-extensive" with the eighth amendment's cruel and unusual punishment clause. *Id*. ¶ 106.

¶ 60 Furthermore, *Patterson* rejected the defendant's contention that the automatic transfer statute in conjunction with the applicable sentencing provisions was unconstitutional under the eighth amendment as applied to nonhomicide offenders, who were "categorically less deserving of the most serious forms of punishment than are murderers." (Internal quotation marks omitted.) *Id*. ¶¶ 107, 110 (quoting *Graham*, 560 U.S. at 69). The *Patterson* defendant had been convicted of three counts of aggravated sexual assault, was sentenced to 36 years in prison, and was statutorily required to serve at least 85% of his sentence. *Id*. ¶ 108. Our supreme court found that although the sentence was lengthy, it did not equal life in prison without parole. *Id*. In addition, Illinois was not required to guarantee a juvenile offender eventual freedom; rather, it only needed to give him a meaningful opportunity to obtain release by showing he had matured and been rehabilitated. *Id*. Furthermore, the Court in *Roper, Graham*, and *Miller* closely limited its reasoning to the most severe of all criminal penalties, not 36-year prison terms. *Id*. ¶ 110. Our supreme court concluded, however, by expressing its own concern with the lack of judicial discretion created by the Illinois automatic transfer statute and strongly urged our legislature to remedy this outmoded statute. *Id*. ¶ 111.

¶ 61 None of the aforementioned precedent holds that a sentence of natural life without the possibility of parole will always be labeled as such. In addition, the as-applied challenge addressed in *Patterson* was, as are all as-applied constitutional challenges, based on the specific facts and argument presented in that case. *People v. Huddleston*, 212 Ill. 2d 107, 131 (2004) (A holding that a statute is unconstitutional as applied depends on the specific facts of the case.). No

one would question that a juvenile defendant who received a cumulative sentence of 200 years in prison, as opposed to the 36-year prison term imposed in *Patterson*, would never have the opportunity to secure his freedom. In addition, while the legislature is generally entitled to mandate the imposition of multiple penalties for multiple offenses, in the context of juvenile defendants, the concerns of *Roper, Graham*, and *Miller* are not satisfied by pretending that a cumulative sentence labeled as a term of years will in all cases be distinct from a sentence of natural life without the possibility of parole. See also *Gridine*, 40 Fla. L. Weekly S149 (finding that a 70-year term for attempted first-degree murder did not give the 14-year-old defendant a meaningful opportunity to be released and was therefore unconstitutional); *Bear Cloud v. State*, 2014 Wy 113, ¶ 37, 334 P. 3d 132 (Wyo. 2014) (examining a juvenile's sentence under the eighth amendment requires consideration of "the entire sentencing package, when the sentence is life without parole, or when aggregate sentences result in the functional equivalent of life without parole"); but see *State v. Brown*, 2012-0872 (La. 5/7/13),118 So. 3d 332 (holding that *Graham* does not apply where a juvenile offender committed multiple offenses resulting in cumulative sentences that exceed his life expectancy). Accordingly, we disagree with other decisions of this court to the extent they suggest that sentences for a term of years and sentences for natural life without parole are mutually exclusive in the context of juveniles and the eighth amendment. See *People v. Reyes*, 2015 IL App (2d) 120471, ¶ 23 (not yet released for publication and subject to withdrawal); *People v. Cavazos*, 2015 IL App (2d) 120171, ¶ 99. In reaching this conclusion, we do not expand eighth amendment precedent; rather, we merely decline to create an arbitrary exception to the eighth amendment's requirements where a juvenile's sentence is in substance a term of natural life without the possibility of parole but in name, a term of years.

¶ 62                                    2. As-Applied Challenge Under the Eighth Amendment

¶ 63      As stated, defendant contends that the automatic transfer statute in conjunction with our

sentencing laws led to a sentence which violated the eighth amendment as applied. The exclusive

jurisdiction provision of the Juvenile Court Act of 1987 provides:

> "Proceedings may be instituted under the provisions of this Article concerning any minor
>
> who prior to the minor's 17th birthday has violated or attempted to violate, regardless of
>
> where the act occurred, any federal or State law or municipal or county ordinance. Except
>
> as provided in Sections 5-125, 5-130, 5-805, and 5-810 of this Article, no minor who was
>
> under 17 years of age at the time of the alleged offense may be prosecuted under the
>
> criminal laws of this State." 705 ILCS 405/5-120 (West 2006).

Defendant was transferred from the juvenile division of the circuit court to the criminal division

as a result of section 5-130, the automatic transfer provision. 705 ILCS 405/5-130 (West 2006).

Section 5-130 states:

> "(1)(a) The definition of delinquent minor under Section 5–120 of this Article shall
>
> not apply to any minor who at the time of an offense was at least 15 years of age and who
>
> is charged with: *** (iii) aggravated battery with a firearm where the minor personally
>
> discharged a firearm as defined in Section 2-15.5 of the Criminal Code of 1961 ***.
>
> These charges and all other charges arising out of the same incident shall be
>
> prosecuted under the criminal laws of this State.
>
> * * *
>
> (c)(i) If after trial or plea the minor is convicted of any offense covered by
>
> paragraph (a) of this subsection (1), then, in sentencing the minor, the court shall have

available any or all dispositions prescribed for that offense under Chapter V of the Unified Code of Corrections." 705 ILCS 405/5-130 (West 2006).

Accordingly, all charges specified in subsection (1)(a) as well as charges arising out of the same incident must be criminally prosecuted, rather than decided in juvenile proceedings. *People v. King*, 241 Ill. 2d 374, 384 (2011). The charging instrument determines whether the minor has a right to be tried in juvenile court. *Id*. at 386. Furthermore, all offenses covered by subsection (1)(a), including those not specifically listed, are subject to adult sentencing. *Id*. at 385-87.

¶ 64    Here, defendant was charged with aggravated battery with a firearm in which he personally discharged a firearm, an offense specified in subsection (1)(a). In addition, that subsection also covered attempted first-degree murder because it arose from the same incident. As a result, defendant was required to be criminally prosecuted for both aggravated battery with a firearm and attempted first-degree murder. Because the trial court convicted defendant of attempted murder, an offense covered by subsection (1)(a), the court was required to sentence defendant under the Unified Code of Corrections (Unified Code) (730 ILCS 5/1-1-1 *et seq*. (West 2006)).

¶ 65    Attempted first-degree murder is a Class X offense. 720 ILCS 5/8-4(c) (West 2006). In addition, the Unified Code provides that "except as otherwise provided in the statute defining the offense, for a Class X felony, the sentence shall be not less than 6 years and not more than 30 years." 730 ILCS 5/5-8-1(a)(3) (West 2006). As stated, the attempt statute provides that "the sentence for attempt to commit first degree murder is the sentence for a Class X felony, except that *** an attempt to commit first degree murder during which the person personally discharged a firearm is a Class X felony for which 20 years shall be added to the term of imprisonment imposed by the court." 720 ILCS 5/8-4(c)(1)(C) (West 2006). Thus, the minimum sentence for

each count was 26 years in prison. Furthermore, these prison terms were required to be served consecutively. 730 ILCS 5/5-8-4(a)(i) (West 2006) ("The court shall impose consecutive sentences if: (i) one of the offenses for which defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury ***."). Accordingly, the combined effect of the automatic transfer statute and sentencing statutes is that the trial court had no discretion to sentence defendant to anything less than 52 years in prison for his attempted murder convictions.

¶ 66    With that said, in determining whether a particular term of years is a natural life sentence in disguise, we must consider whether the defendant may be released from prison in his lifetime. Available credit may substantially reduce a defendant's stay in prison. In addition, our supreme court in *Patterson* considered the potential credit available to the defendant. *Patterson*, 2014 IL 115102, ¶ 108. In furtherance of our inquiry, we asked the parties to submit supplemental briefing regarding the age at which defendant may be released from prison considering available sentencing credit. See 730 ILCS 5/3-6-3 (West 2006); 730 ILCS 5/5-8-7(b) (West 2006). While the parties' means of calculating defendant's potential release date differ somewhat, they contend he could be released at age 59 or 60. In addition, the Illinois Department of Corrections' (IDOC) website lists defendant's projected parole date as February 28, 2052, based on both the convictions before us as well as defendant's possession of a controlled substance and aggravated battery convictions. See *People v. Sanchez*, 404 Ill. App. 3d 15, 17 (2010) (finding that this court can take judicial notice of the IDOC's website).[4] On that date, defendant will be 60 years old. Furthermore, defendant alleged in the trial court that his average life expectancy was 67.8 years. Accordingly, it appears that defendant can, and likely will, spend the last several years of life

---

[4] We note that the IDOC mistakenly indicates that defendant was born in 1990 rather than 1991.

outside of prison, unless of course, he commits additional offenses that negate that possibility or otherwise jeopardizes his sentencing credit.

¶ 67    Strictly speaking, this particular term of years, as applied to this defendant, does not constitute a natural life sentence without the possibility of parole. Defendant conceded as much during oral argument in this case. Although defendant's years in society will be precious few, the United States Supreme Court has drawn the eighth amendment line at life without the possibility of parole and we cannot cross that line. Defendant cannot demonstrate that as applied to him, Illinois' transfer and sentencing scheme violates the eighth amendment.

¶ 68                              3. The Proportionate Penalties Clause

¶ 69    With that said, we agree with defendant that the statutory scheme is unconstitutional under the Illinois Constitution of 1970, as applied to defendant, in that his sentence shocks the moral sense of the community. Our constitution states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To succeed on a proportionate penalties claim, the defendant must demonstrate either that the penalty is degrading, cruel "or so wholly disproportionate to the offense that it shocks the moral sense of the community" or, that another offense containing the same elements has a different penalty. *People v. Klepper*, 234 Ill. 2d 337, 348-49 (2009). In addition, the second clause was added to section 11 by the 1970 constitution. *People v. Clemons*, 2012 IL 107821, ¶ 39. "[T]he framers intended, with this additional language, to provide a limitation on penalties beyond those afforded by the eighth amendment." *Id.* Based on this additional language, as well as the overall difference in wording between section 11 and the eighth amendment, our supreme court has found it is inaccurate to say that these two constitutional provisions are synonymous, although the relationship between them is

certainly unclear. *Id.* ¶¶ 36-37. Contrary to the State's assertion at oral argument, *Clemons* did not limit its recognition that these constitutional provisions differ to alleged proportionate penalties violations where offenses with identical elements have different penalties. Accordingly, we reject the State's assertion that whether a sentence is disproportionate in that it shocks the moral sense of the community must be determined in lockstep with the eighth amendment.

¶ 70     Our supreme court's decision in *Patterson* does not alter our determination. In addressing the defendant's facial challenge to the transfer statute under the eighth amendment, our supreme court found the defendant's challenge failed because the transfer statute did not itself impose actual punishment, as required to mount a successful eighth amendment challenge. *Patterson*, 2014 IL 115102, ¶ 106. The court went on to say that "[b]ecause the Illinois proportionate penalties clause is *co-extensive* with the eighth amendment's cruel and unusual punishment clause (*In re Rodney H.*, 223 Ill. 2d 510, 518 (2006)), we also reject defendant's challenge under our state constitution." (Emphasis added.) *Id.* We do not believe the court intended to depart from its prior statements in *Clemons*; rather, it appears the court meant only that like the eighth amendment, the proportionate penalties clause does not apply unless a penalty has been imposed. See *People v. Boeckmann*, 238 Ill. 2d 1, 16-17 (2010) (finding that the eighth amendment and the proportionate penalties clause are "coextensive" in that both require the government to inflict punishment); *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 206-07 (2009) (same); *In re Rodney H.*, 223 Ill. 2d at 518 (same). Consistent with that reading, *Patterson* proceeded to consider defendant's argument that the transfer statute in conjunction with the sentencing statutes, undoubtedly amounting to a penalty, was unconstitutional as applied. Because the eighth amendment is not synonymous with the proportionate penalties clause, we address defendant's argument under the latter provision.

¶ 71     The State asserted at oral argument that we must focus on defendant's conduct and disregard his personal characteristics in determining whether his sentence shocks the moral sense of the community. Specifically, the State argues that the "best" example of this principle is *Harmelin v. Michigan*, 501 U.S. 957 (1991).  First, we note that the United States Supreme Court was not concerned with Illinois' proportionate penalties clause, and thus, *Harmelin* does not control the issue before us. *Id*. In addition, *Harmelin* acknowledged cases referring to sentences that "shock public sentiment" (internal quotation marks omitted) but did not apply such terminology to the facts before it, upholding the adult defendant's sentence on a different basis. *Id*. at 985.  In addition, the dissent considered the defendant's conduct but did not specify that a defendant's personal characteristics are irrelevant. *Harmelin*, 501 U.S. at 1021 (White, J., dissenting, joined by Blackmun and Stevens, J.J.). Instead, the dissent, which found an eighth amendment violation occurred, considered that the defendant was a first-time offender, which has as much to do with defendant's characteristics as his conduct. *Id*. at 1026. The State's best example falls short of a compelling argument. Even assuming that eighth amendment precedent is relevant to the State's contention, the *Roper*, *Graham* and *Miller* line of case law focused extensively on defendants' characteristics, *i.e.*, their status as juveniles and resulting attributes.

¶ 72     Moreover, the proportionate penalties clause demands consideration of the defendant's character by sentencing a defendant with the objective of restoring the defendant to useful citizenship, an objective that is much broader than defendant's past conduct in committing the offense. Although the seriousness of a defendant's conduct may in many cases outweigh mitigating factors regarding a particular defendant, it does not follow that a defendant's personal characteristics are irrelevant. Furthermore, we find our supreme court's decision in *People v. Miller*, 202 Ill. 2d 328 (2002) (*Leon Miller*) suggests that a defendant's conduct is not the sole

consideration. *Id*. at 340-42 (observing that the statutory scheme did not permit consideration of the defendant's age and his "individual level of culpability," and that the natural life sentence imposed shocked the conscience where the offender was 15 years old, had one minute to contemplate his decision and was only a lookout). While the facts of this case are not as compelling as those presented in *Leon Miller*, we nonetheless find that case supports an inquiry into both defendant's conduct and defendant himself.

¶ 73    Defendant's penalty in this case is so wholly disproportionate that it shocks the moral sense of the community. To be sure, this was a serious offense. As the trial court found, "it was nothing but an ambush." In addition, Smith's injuries were severe. Despite that, numerous factors diminish the justification for a 52-year prison term. Assuming that defendant knew exactly what was going to happen at the gas station, the record does not indicate that the incident was planned long before it occurred; rather, it appears to have resulted from rash decision making. The record also shows that as a juvenile with mental illness, defendant was prone to impulsive behavior. In addition, defendant may very well have been motivated by a desire to impress his older brother. According to Lerner's pretrial report, defendant's mother said defendant was a follower. Although defendant was fortunate in having bad aim, it is also true that he personally did relatively minimal damage.

¶ 74    Furthermore, we cannot ignore evidence regarding defendant's mental state at the time of the offense. While mental fitness for trial differs from mental fitness to function in the world, we find it meaningful that defendant had been declared unfit to stand trial before this offense occurred. He was clearly not at his peak mental efficiency when the shooting occurred. As the trial court found, our system failed defendant, and after the State dropped charges against him in the Ryan Harris case, defendant's mental health issues were not appropriately addressed. In

addition, defendant's impaired ability to process information may have affected his judgment. These factors diminish both defendant's culpability and the need for retribution. Furthermore, the record suggests that defendant's mental health has improved in the more recent past, at least to some degree. Thus, defendant may yet be rehabilitated and restored to useful citizenship. *Cf. People v. Harlow*, 246 Ill. App. 3d 196, 199 (1993) (observing that a sentence is proportional if it correlates with the seriousness of the offense and adequately considers the defendant's rehabilitative potential). This juvenile's 52-year sentence, however, seems more consistent with eliminating his utility as a citizen.

¶ 75    The State correctly observes that the trial court considered defendant's youth and mental disorders. The sentencing scheme, however, did not permit the court to give those factors appropriate weight. The court's choice was to see that defendant remain in prison for life or spend only the last few years of his life outside the prison walls, all for a crime that he committed at age 15, while his mental health was questionable at best, when it could not be said that he was irredeemable, and for a crime in which no one died. We also note that codefendant apparently pled guilty and was sentenced to 31 years in prison. *Cf. People v. Reckers*, 251 Ill. App. 3d 790, 796 (1993) (finding that a defendant who has proceeded to trial cannot compare his sentence to sentences imposed on defendants who pled guilty).

¶ 76    As the State concedes, speculation is not required to form the opinion that Judge Flaherty would have imposed a shorter sentence if given the statutory license to do so. Following testimony at the sentencing hearing, the court immediately asked the ASA to identify the minimum permissible sentence. Judge Flaherty also stated, it "doesn't matter what I think is appropriate, what I don't think is appropriate. They took that out of my hands a long time ago." Additionally, we find it unsettling that in sentencing a juvenile, the trial court's discretion was

frustrated by the legislature's decision to impose a mandatory firearm enhancement more than three times the length of defendant's attempted murder sentence. We are not the first to express concern regarding the impact of mandatory enhancements on juvenile defendants. See also *Cavazos*, 2015 IL App (2d) 120171, ¶ 102 (noting that the mandatory firearm enhancement was twice the underlying sentence). While the legislature's discretion to prescribe penalties includes the power to prescribe mandatory sentences that restrict the judiciary's own discretion (*Leon Miller*, 202 Ill. 2d at 336), the legislature's discretion is limited by our constitution. Under these specific circumstances, defendant's sentence shocks the conscience and cannot pass constitutional muster.

¶ 77     Having determined that as applied, the automatic transfer statute in conjunction with the sentencing scheme led to a sentence that violates the proportionate penalties clause, we now determine what remedy is appropriate. Defendant asks that we reverse and remand this case for the trial court to determine, pursuant to the Juvenile Court Act, whether defendant should be sentenced as an adult. Essentially, he asks that we not give effect to the automatic transfer statute. Defendant's proposed remedy curiously attacks one of several statutes that led to his sentence. The State has not provided a proposed remedy, staunchly adhering to its position that defendant's sentence is constitutionally sound.

¶ 78     We find it more appropriate to modify application of our sentencing statutes, as the proportionate penalties clause focuses on the penalty. Although the legislature's mandate of 52 years is disproportionately long here, it does not follow that the legislature could require nothing more onerous than defendant's release at age 21, as defendant's conduct was serious. We are sympathetic to the fact that defendant may have been released at age 21 had he committed the offense just months earlier, at age 14, rather than one month past his fifteenth birthday. In the

context of the proportionate penalties clause, however, we consider the propriety of defendant's penalty, not whether this seemingly arbitrary distinction is reasonable. In addition, the trial court's discretion to impose an appropriate sentence was most defeated by the mandatory sentencing enhancement. At oral argument, defense counsel conceded that eliminating the mandatory firearm enhancement would alleviate this constitutional defect. Accordingly, in the event that the trial court on remand determines that defendant was fit to stand trial, we direct the trial court to impose, on both attempted murder counts, any appropriate Class X sentence under the Unified Code, without regard to the mandatory enhancement. If the trial court instead determines that a new trial is warranted, our decision should guide sentencing in the event that defendant is convicted once more. In light of our determination, we need not consider defendant's remaining contentions.

¶ 79                                    III. CONCLUSION

¶ 80     In conclusion, the particular stipulations entered into at defendant's restoration fitness hearing were not inappropriately conclusive, but they did raise questions that could not adequately be resolved on the stipulations alone.  Accordingly, we reverse and remand for a retroactive fitness hearing.  If the trial court finds that defendant was unfit at the time of his trial or that the evidence is inconclusive, he is entitled to a new trial.  If the court is able to determine that defendant was fit at his trial, the court will affirm defendant's conviction and proceed to a new sentencing hearing, at which the court will disregard the statutorily mandated firearm enhancement.  We join our supreme court and colleagues in the appellate court in urging the legislature to expeditiously address the inability of our present statutory scheme to provide allowances for the special considerations that youth warrants.  We are confident that as the state which created this country's first juvenile court (*Willis*, 2013 IL App (1st) 110233, ¶ 39), our

legislature is capable of improving our current laws. Until then, we respect our legislature's prior determinations regarding what penalties are appropriate and how the trial courts' sentencing discretion should be limited, so long as those penalties do not violate constitutional protections.

¶ 81    For the foregoing reasons, we reverse and remand for further proceedings consistent with this opinion.

¶ 82    Reversed and remanded.