2026 IL App (4th) 250577-U

NO. 4-25-0577

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

FILED
June 16, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| BOBBY E. MARTIN III, | ) | No. 21CF520 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Katherine S. Gorman, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Zenoff and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court remanded for a retrospective fitness restoration hearing, concluding the record did not show the trial court exercised independent discretion in making a finding that defendant was restored to fitness.

¶ 2    Defendant, Bobby E. Martin III, appeals his convictions for predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)) and criminal sexual assault (*id.* § 11-1.20(a)(3)). He contends the trial court erred when it failed to make an independent inquiry into his fitness and relied on the parties' stipulation to the Illinois Department of Human Services (DHS) finding that defendant had been restored to fitness. For the reasons that follow, we remand for a retrospective fitness restoration hearing.

¶ 3                                I. BACKGROUND

¶ 4                                A. The Charges

¶ 5    On August 31, 2021, a grand jury returned a true bill of indictment, charging

defendant with predatory criminal sexual assault of a child (*id.* § 11-1.40(a)(1)), a Class X felony (count I), and criminal sexual assault (*id.* § 11-1.20(a)(3)), a Class 1 felony (count II). Count I alleged that on or about July 17, 2021, defendant, who was 17 years old or older, committed an act of sexual contact with Z.E., who was under 13 years old at the time of the offense. Count II alleged that on or about the same date as the previous charge, defendant committed an act of sexual penetration with Z.E., a family member who was under the age of 18 at the time of the offense.

¶ 6                                 B. Defendant's Fitness

¶ 7                        1. *Dr. Terry Killian's Initial Psychiatric Report*

¶ 8          On March 3, 2022, at the request of defense counsel, the trial court appointed a psychiatrist, Dr. Terry Killian, to perform a psychiatric evaluation of defendant.

¶ 9          Dr. Killian completed his report on October 21, 2022. In it, he provided the following information. He met with defendant over Zoom in May 2022, when defendant was in custody of the Peoria County jail, to determine defendant's fitness to stand trial and to assist defense counsel in his overall defense. Prior to his interview with defendant, Dr. Killian reviewed police reports and the interrogation video.

¶ 10          Defendant had an unsubstantiated history of bipolar mood disorder, a reported history of attention deficit hyperactivity disorder (ADHD), possible mood dysregulation disorder, a reported history of asthma in remission, and probable borderline intellectual functioning. Dr. Killian opined defendant was somewhat intellectually impaired, but he did not have enough information to give a good estimate of defendant's functioning. He placed defendant in the category of borderline intellectual functioning, "which is the area between normal IQ and the diagnosis of mild intellectual impairment." Dr. Killian concluded defendant

was fit to stand trial, with some caveats. Specifically, he noted, although defendant demonstrated reasonably good understanding of the nature of the proceedings against him, he obviously had intellectual disabilities and would need significantly more support and explanation from his attorney than the average defendant. Defense counsel would need to explain the matters in the case to defendant slowly and write out the most important parts. He also concluded, at the time of defendant's interrogation by police, defendant would not have been able to knowingly and willingly waive his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 11 Dr. Killian recommended if the trial court or defense counsel wanted defendant to understand something, they would need defendant to repeat the information back to them. It would not be sufficient for the court or defense counsel to simply ask defendant if he understood what was said because it was typical for people of limited intellectual functioning to say yes when they were asked if they understood something, even if they did not.

¶ 12 2. *The Psychiatric Report of Drs. Jean Clore and Ryan Finkenbine*

¶ 13 In August 2023, the defense filed a motion to suppress defendant's inculpatory statements to the police after receiving Dr. Killian's opinion concluding defendant would have been unable to knowingly and intelligently waive his *Miranda* rights. In response, the State indicated it was going to reach out to Ryan Finkenbine, MD, for a second opinion and noted the doctor might need to interview defendant again.

¶ 14 In September 2023, Dr. Finkenbine and Jean Clore, PhD, from the University of Illinois College of Medicine in Peoria, Illinois, completed a second psychiatric evaluation. Their findings were outlined in a forensic psychiatry and psychology center summary report dated September 29, 2023. In conducting their evaluation, Drs. Clore and Finkenbine relied upon their own forensic interview of defendant, as well as the true bill of indictment, police records and

reports, three police interviews, the forensic psychiatric report completed by Dr. Killian, and defendant's medical records. They noted defendant had previously been diagnosed with ADHD and disruptive mood dysregulation disorder, though he appeared to have outgrown both. Further, they opined the following: using the Diagnostic and Statistical Manual of Mental Disorders-Fifth Edition, defendant met the criteria for a diagnosis of mild intellectual disability; he was not competent to knowingly, intelligently, and voluntarily waive his *Miranda* rights; at the time of his interview, defendant was not fit to stand trial; and due to the chronicity of his intellectual disabilities, it was unlikely defendant would attain fitness within the next year.

¶ 15        The report further explained why defendant was unfit and unlikely to attain fitness. Defendant's social and educational history supported his intellectual disability. The report noted defendant had been placed in special education classes at a young age and eventually transferred to a highly restrictive setting for children with learning and behavioral problems. Defendant had never held employment or lived independently. In the present case, defendant had acquired a significant amount of information from his attorney and was able to explain certain concepts, which included his charges, that the role of the State was "going against" him to "prove [he] did something wrong," and that there are typically 12 jurors, though in a bench trial, it is "just you and the judge." However, defendant's responses lacked intellectual understanding and application in that they were "near-misses or oddly worded," indicating a lack of intellectual understanding and application. He was frequently confused by questions, even when they were stated simply. He could not properly respond to follow-up questions unless the topic was repeated. Although defendant was able to provide some correct answers to fitness assessment questions, he made errors, was unable to connect the information in a meaningful way and could not adapt it to his situation. Consequently, defendant did not have a rational

understanding of the proceedings against him, and it was unlikely he would be able to attain fitness within a year because there was no treatment for intellectual disability. The report cautioned, "It is likely that [defendant] could learn to regurgitate memorized answers that might lead him to appear competent, but meaningful understanding and application of that information would still be impaired."

¶ 16                        3. *The State's Motion for a Fitness Hearing*

¶ 17        On October 4, 2023, the State filed a motion for a fitness hearing pursuant to section 104-11 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/104-11 (West 2022)). In it, the State argued there existed *bona fide* doubt as to defendant's fitness, as evidenced by the report of Drs. Clore and Finkenbine.

¶ 18                        4. *Dr. Killian's Updated Psychiatric Report*

¶ 19        On October 9, 2023, approximately a year after his initial report, Dr. Killian provided an updated report regarding defendant's fitness. He referenced Drs. Clore and Finkenbine's report, noting they agreed with his finding that defendant was unable to waive his *Miranda* rights but had different opinions regarding defendant's fitness to stand trial. Dr. Killian explained their report somewhat altered his initial view regarding defendant's fitness.

¶ 20        Dr. Killian noted that in his first report, he did not have enough information to give a good estimate of defendant's level of functioning, but he was able to say with confidence defendant was somewhat intellectually impaired. He originally placed defendant "in the category of borderline intellectual functioning, which is the area between normal IQ and the diagnosis of mild intellectual impairment (what used to be called mild mental retardation)." Dr. Killian believed Drs. Clore and Finkenbine's assessment of defendant's intellectual functioning was likely more accurate because of their review of defendant's medical records from Carle Health

Methodist Hospital, which Dr. Killian had not seen. Although Dr. Killian's previous opinion appeared opposite to Drs. Clore and Finkenbine's, he explained their opinion was not much different from what he wrote in his initial report. Initially, he believed defendant was only marginally fit, and he made it clear defendant had obvious intellectual disabilities and would need significant support from his attorney. He noted, "If there were some cut-off line between fit and not fit, I would have said last year that [defendant] was above that line, but not by very much." After considering the report by Drs. Clore and Finkenbine, Dr. Killian changed his opinion, concluding defendant was "at least somewhat below that line." Thus, Dr. Killian concluded defendant was not fit to stand trial and he was unlikely to be restored to fitness because his mild intellectual disability could not be improved. He also opined commitment to DHS would not be helpful to defendant.

¶ 21                                5. *The Initial Fitness Hearing*

¶ 22            In October 2023, the trial court conducted a hearing pursuant to section 104-13 of the Code regarding defendant's fitness (*id.* § 104-13). The parties presented the psychiatric reports, including Dr. Killian's initial and updated report and Drs. Clore and Finkenbine's report. The parties stipulated to the reports and requested, if the court determined defendant was currently unfit, he be ordered into the custody of DHS for fitness restoration in a secure facility.

¶ 23            The trial court reviewed the stipulated reports and found defendant unfit to stand trial. It remanded defendant to DHS custody for fitness restoration.

¶ 24                                6. *DHS Progress Reports*

¶ 25            In November 2023, DHS provided a preplacement evaluation of defendant to the trial court. The results of the evaluation showed defendant remained unfit to stand trial. Choate Mental Health Center (Choate Center) was determined to be the most appropriate inpatient

setting for a formal assessment of defendant; he was then transferred to the facility.

¶ 26    In December 2023, DHS provided a 30-day progress report to the trial court. According to the report, Choate Center was designed for individuals with mild to moderate intellectual disabilities who had the ability to learn new material, comprehend abstract legal terms and topics, and demonstrate qualities including cooperation, self-control, and respect on a consistent basis. Upon admission, it was determined defendant met the criteria for intellectual and adaptive functioning deficits. These issues began before he was 18 years old, as shown by his school records. Defendant's history of ADHD, bipolar disorder, and disruptive mood disorder were also noted. The report concluded defendant was unfit to stand trial, and it was undetermined if he would be able to attain legal fitness in the future. The bases for the finding included defendant's inability to understand the terminology needed to proceed in court and his failure of the Illinois Forensic Fitness Test (IFFT). The assessment required defendant to exhibit general orientation in four categories—referenced as person, place, time, and legal situation. In addition, the assessment required a passing score of 80% on a multiple-choice exam on matters related to court orientation. Defendant was determined not to be oriented to his place or legal situation and received a failing score of 70% on the multiple-choice portion of the assessment. Defendant did not know the charges against him or the class or the incarceration period for each charge. As it pertained to the sexual assault allegations, defendant stated, "I don't remember doing that."

¶ 27    A 90-day progress report was completed in April 2024. The report noted defendant began taking psychotropic medication (25 milligrams of sertraline daily) in March 2024. DHS repeated the IFFT assessment, and defendant failed again. Defendant received a passing score of 80% on the multiple-choice portion of the exam; he was also determined to be

oriented to person, place, and time. However, because he was not oriented to the legal situation, he failed the exam. The report further explained defendant did not appear to understand the seriousness of his charges; he displayed some threatening and aggressive behaviors, likely due to mental health issues; and he needed time for the medication he was taking to reach its full effect. The report concluded defendant remained unfit to proceed, but it now also concluded he would become fit in the future.

¶ 28　　　　DHS completed a final 90-day progress report in September 2024 and determined defendant was fit to proceed. The report noted defendant had a history of psychiatric diagnoses and the medication review team at DHS had increased the dosage of defendant's psychotropic medication, sertraline, to 100 milligrams a day, and added a new medication, clonidine. DHS also determined defendant had generalized mood disorder, generalized anxiety disorder, and ADHD. Defendant was once again administered the IFFT assessment. This time, he passed the exam by being oriented to person, place, time, and his legal situation and scoring a passing score of 90% on the multiple-choice portion of the assessment. Because of his passing score on the IFFT, he was administered the Competence Assessment for Standing Trial for Defendants with Mental Retardation (CAST-MR), which required a score of 80% or above to pass in any respective category. The categories in the CAST-MR included basic legal concepts, skills to assist in one's defense, and understanding case events. Defendant passed each category with a score of 90% or above.

¶ 29　　　　　　　　7. *Subsequent Fitness Review Hearings*

¶ 30　　　　In January, April, and July 2024, fitness review hearings were held. At each hearing, the parties stipulated to the reports from DHS finding defendant unfit and unlikely to obtain fitness within a year.

¶ 31        Finally, in September 2024, DHS determined defendant was fit to stand trial. This information was presented to the trial court at a hearing in October 2024. By agreement, the parties requested the court make a finding based on the final DHS report. In its oral pronouncements, the court stated, "Well, based upon the Court's review of the stipulated report dated September the 17th of 2024, the Court finds [defendant] is fit to stand trial." However, the report of proceedings does not reflect the attorneys stipulated to the DHS report. At the end of the hearing, defense counsel requested defendant be evaluated by Dr. Clore's office for an "insanity of mental health" defense.

¶ 32                        C. Defendant's Waiver of a Jury Trial

¶ 33        Four months later, in February 2025, defendant signed a waiver of his right to a jury trial. During the trial court's questioning of defendant, it engaged in the following colloquy:

> "THE COURT: *** So, you have—but you are the one making the decision with respect to whether or not you want a jury or a bench trial; is that correct?
>
> [DEFENDANT]: Yeah.
>
> THE COURT: And you understand the difference between the two?
>
> [DEFENDANT]: Yeah.
>
> THE COURT: All right. And no one forced or threatened—
>
> [DEFENDANT]: No.
>
> THE COURT: —you to sign this; is that correct?
>
> [DEFENDANT]: No. Yeah. Nobody did.
>
> THE COURT: All right. And you're not under the influence of any drugs or alcohol?

[DEFENDANT]: No. I'm just not in the right state of mind because I get meds for my right to stand trial.

THE COURT: You take meds?

[DEFENDANT]: Yeah. I take meds out in the community, and this shit have been out the window because I wasn't in the right state of mind at the incident. I take meds for me to be fit out in the world.

THE COURT: Are you currently taking the proper dosage of your medication?

[DEFENDANT]: No, I can't. I can't take meds because they said they're too steroid. So, they're saying that I can't have any kind of those—I can't be in the county jail.

THE COURT: You currently are in the county jail.

[DEFENDANT]: Yeah. I can't take them in the county jail. So, I need to be in some institution, [Y]our Honor, because I—

THE COURT: Well, hold it, [defendant]. At this point, it has been determined that you are fit to stand trial. You understand that, right?

[DEFENDANT]: I'm not fit to stand trial because I'm not in the right state of mind.

THE COURT: Well, that's your opinion, but the medical folks have decided you are fit to stand trial. All right? And you understand that you're giving up your right to a trial before a jury; is that correct?

[DEFENDANT]: Yes.

THE COURT: And you understand you can't take that back?

- 10 -

[DEFENDANT]: Yes.

THE COURT: All right. And—

[DEFENDANT]: And I also understand I do have the right to say some stuff if I'm not in the right state of mind.

THE COURT: Well, I'm going to counsel you that some of these things could be used against you at a later time. So, I'm going to accept your waiver of trial by jury, and it looks like we're going to set that bench trial for February the 28th at 9:00 AM."

¶ 34                                    D. Bench Trial

¶ 35         The matter proceeded to a bench trial in April 2025. The trial court returned a verdict of guilty but mentally ill as to both counts. The court ordered a presentence investigation report to be completed and set a date for posttrial motions and sentencing.

¶ 36                              E. Defendant's Sentencing

¶ 37         On June 6, 2025, defendant was sentenced to 15 years in prison on count I, predatory criminal sexual assault of a child, with 3 years' mandatory supervised release. Sex offender registration was also mandated by statute. No sentence was imposed on count II.

¶ 38         This appeal followed.

¶ 39                                    II. ANALYSIS

¶ 40         On appeal, defendant argues the trial court erred in finding he was restored to fitness. He contends the court erred when it failed to make an independent inquiry into his fitness and instead relied exclusively on the conclusions by DHS and the parties' stipulations.

¶ 41         Initially, we note defendant acknowledges he failed to preserve this issue for review. However, he claims, and we agree, the issue may be reviewed under the plain error

doctrine. The plain error doctrine

> "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence."
>
> *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

Because a defendant's fitness to stand trial involves a fundamental right, we review it under the second prong. See *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 28 (holding that because a defendant's fitness to stand trial involves a fundamental right, any alleged errors concerning fitness may be reviewed for plain error).

¶ 42 The due process clause of the fourteenth amendment (U.S. Const., amend. XIV) bars the prosecution of a defendant who is unfit to stand trial. *People v. Holt*, 2014 IL 116989, ¶ 51. While the United States Supreme Court has articulated the constitutional standard for fitness to stand trial, the Illinois legislature has codified the state's standard regarding a defendant's fitness in section 104-10 of the Code (725 ILCS 5/104-10 (West 2022)). It states a defendant is presumed to be fit, but if he is unable to understand the nature and purpose of the proceedings against him or is unable to assist in his defense, he will be deemed unfit. *Id.* Fitness involves a defendant's ability to function at trial, not his sanity or competence in other contexts; therefore, a defendant may be fit but otherwise mentally unsound. *People v. Taylor*, 409 Ill. App. 3d 881, 896 (2011).

¶ 43 Generally, a trial court's determination that a defendant is fit to stand trial will not

be reversed unless it is against the manifest weight of the evidence. *People v. Conner*, 2025 IL App (4th) 240972, ¶ 22. However, because the issue of fitness is constitutional, the record must affirmatively show the court exercised judicial discretion in making its fitness determination. *Gipson*, 2015 IL App (1st) 122451, ¶ 29.

¶ 44 When a defendant is found unfit and treatment is ordered, the trial judge must periodically review the issue of the defendant's fitness to stand trial and set the matter for a hearing upon receiving a report that the defendant has attained fitness. 725 ILCS 5/104-20(a) (West 2022). After the trial court receives the examiner's report, it "shall conduct a hearing to determine the issue of the defendant's fitness." *Id.* § 104-16(a). In addition, a prior adjudication of unfitness raises the presumption a defendant remains unfit, and the presumption continues until there has been a valid restoration hearing finding him fit. *Gipson*, 2015 IL App (1st) 122451, ¶ 29. A restoration hearing requires a high level of judicial scrutiny, and extra precautions may be necessary to ensure the bases of an expert's report regarding a defendant's fitness are justified. *People v. Gillon*, 2016 IL App (4th) 140801, ¶ 27. "Where a trial court fails to conduct an independent inquiry into a defendant's fitness but, instead, relies exclusively on the parties' stipulation to a psychological report finding the defendant fit, the defendant's due process rights are violated." *People v. Cook*, 2014 IL App (2d) 130545, ¶ 15. "In other words, the court may not simply rubber stamp an expert's ultimate conclusion that a defendant has been restored to fitness." (Internal quotation marks omitted.) *Gillon*, 2016 IL App (4th) 140801, ¶ 21. Because a potential error in a DHS restoration finding may subject an otherwise unfit person to a trial and sentencing, the "court should take great care to ensure to its satisfaction the defendant's fitness has been restored." *Id.* ¶ 27.

¶ 45 Here, the record does not affirmatively show the trial court's judgment was a

product of judicial discretion when it deemed defendant had been restored to fitness. It is not apparent from the record that the parties even stipulated to the final DHS report. During prior status hearings, the record reflects the attorneys specifically stated they stipulated to the contents of the reports from DHS. But that did not occur here. Instead, the following exchange occurred:

"[DEFENDANT'S COUNSEL]: I recently received a document from [DHS]. I've provided a copy to the State as well as the Court. In summary it indicates that [defendant] is now fit to proceed, and it documents its findings within that report. I believe it's by agreement that both the State and myself are requesting the Court to make that finding today and then set it over for a scheduling conference as well as a hearing on a previously filed motion ***.

THE COURT: Anything from the State?

[THE STATE]: No, Your Honor.

THE COURT: All right. Well, based upon the Court's review of the stipulated report dated September the 17th of 2024, the Court finds [defendant] is fit to stand trial.

***

[DEFENDANT]: Okay. Hey, do you think I can ask you a few questions for me?

THE COURT: Probably those should be reserved for your attorney. Does it relate to your case?

[DEFENDANT]: Yes. I have something in my background that can make the fight for me fit to stand trial and, possibly, it relies on my disability and they need to be looking in—

[THE COURT]: All right. That is something you can consult with your attorney about. In the interim, we'll see you on January 23rd.

Thank you, [defendant]."

The court relied solely on the report from DHS finding defendant had been restored to fitness and assumed the attorneys stipulated to the DHS report. A trial court cannot restore a defendant to fitness based solely on the parties' agreement or a DHS conclusion. See *People v. Thompson*, 158 Ill. App. 3d 860, 865 (1987) (holding a finding of fitness may not be based on a stipulation to psychiatric conclusions). "The court must state on the record the factual basis for its finding, which must be more than a mere acceptance of a stipulation that the defendant is fit or that an expert found the defendant fit." *Cook*, 2014 IL App (2d) 130545, ¶ 20. Here, the court did not provide an explanation for its finding; it did not question defendant; it did not question his counsel; and it did not provide an analysis comparing DHS's conclusion to the court's own observations, nor did it make clear how it resolved conflicting opinions between the experts who assessed defendant was unfit and would likely never be fit due to limited intellectual abilities and the DHS psychologist who determined defendant had been restored to fitness. Neither did the court employ any of the suggestions from the doctors to ensure defendant understood what was occurring. Without anything to indicate the court reviewed the report or made other independent observations, we are left to question whether the court made an independent finding of restoration to fitness.

¶ 46        The trial court's handling of defendant's jury trial waiver disregarded expert assessments of his intellectual limitations and failed to ensure defendant truly understood the rights he was relinquishing. Dr. Killian indicated, due to his intellectual disability, defendant would require slower and more detailed explanations of important concepts and significantly

more support from his counsel to ensure his true understanding. However, the court neither explained the concept of waiving a jury to defendant "very slowly and clearly," nor did the court have defendant's attorney assist him with his understanding of the questions. The record does not reflect if any of the important points were written out and discussed with defendant. Defendant responded to the court's questions, but his responses may have been "rote repetitions of information learned" rather than expressing concepts in his own words. Dr. Killian specifically mentioned it was not enough to simply ask defendant if he understood something. Further, Dr. Killian noted the standard response of "yes" is very typical of people with limited intellectual functioning. This typical response is exactly what defendant gave when he was questioned about waiving his right to a jury trial.

¶ 47 "[W]here a defendant was previously adjudicated to be unfit to stand trial, a presumption exists that the condition of unfitness remains until the defendant has been adjudicated to be fit at a valid subsequent hearing." *Gipson*, 2015 IL App (1st) 122451, ¶ 29. Because of the constitutional ramifications involved in a restoration hearing, the trial court was obligated to employ a high level of judicial scrutiny. In this case, there is nothing in the record indicting the court reviewed and considered the reports of Dr. Killian or Drs. Clore and Finkenbine. Further, the brief exchange on the record during the final fitness review hearing where the court summarily deemed defendant restored to fitness does not show active discretion from the court, let alone judicial scrutiny, and therefore does not satisfy due process. See *id.* ("[T]he court should be active, not passive, in assessing a defendant's fitness."); compare *Cook*, 2014 IL App (2d) 130545, ¶ 15 ("[W]here a trial court's finding of fitness is based not only on stipulations but also on its observations of the defendant and a review of a psychological report, the defendant's due process rights are not offended."). Ultimately, the court had a duty to

conduct further analysis by providing additional observations or findings on the record when reaching its determination. Consequently, the court erred by failing to conduct a restoration hearing meeting the minimal due process standards necessary to enable the court to find defendant restored to fitness.

¶ 48 Having determined the trial court committed error, the appropriate remedy is to remand for the court to conduct a retrospective fitness hearing on defendant's fitness to stand trial. At the hearing, the court should (1) review the reports of Dr. Killian, (2) review the report of Drs. Clore and Finkenbine, (3) examine the reports from DHS, (4) examine the relevant report of proceedings, (5) hear from witnesses who can testify about defendant's fitness at the time of trial, (6) determine if the parties stipulate to the contents of the report finding defendant attained fitness, and (7) make an independent determination as to defendant's fitness at the time of trial. See *People v. Zoph*, 2023 IL App (2d) 220123-U, ¶ 71 (citing *Cook*, 2014 IL App (2d) 130545, ¶ 22). At the retrospective fitness hearing, "[i]f the [trial] court determines that evidence is inconclusive or suggests that the defendant was unfit, defendant is entitled to a new trial." *Gipson*, 2015 IL App (1st) 122451, ¶ 38. If the court determines defendant's fitness at the time of his trial can be assessed and confirmed, his conviction shall be affirmed.

¶ 49                                III. CONCLUSION

¶ 50 For the reasons stated, we remand the cause for a retrospective determination on defendant's fitness. If the trial court finds defendant was unfit at the time of trial or that the evidence was inconclusive as to his fitness, defendant is entitled to a new trial. If, however, the court can determine that defendant was fit at his trial, the conviction will stand.

¶ 51 Remanded with directions.